OPINION OF THE COURT
Bernard J. Fried, J.
Defendants, James Tansey and Vernon Smith, are charged *235 in two separate indictments with similar crimes arising out of their alleged possession of stolen New York State telephone authorization codes, similar to telephone calling card numbers, that were used to obtain telephone services. Because there are common issues raised in their motions to dismiss each indictment, I will address them in a single decision. I will then turn to the separate arguments raised by each defendant challenging other crimes with which each alone has been charged: Smith’s attack upon one count charging him with defrauding the government (Penal Law § 195.20); and Tansey’s constitutional challenge to two counts charging him with divulging an eavesdropping warrant (Penal Law § 250.20).
THE CRIMINAL POSSESSION AND LARCENY COUNTS
First, with regard to both defendants, there are two central questions presented, the resolution of which requires application of the basic rules of statutory interpretation:
(1) whether the knowing "possession” of stolen information, i.e., a telephone calling card number, constitutes the crime of criminal possession of stolen property in the fourth degree (Penal Law § 165.45 [1], [2]); and
(2) whether the use of such a telephone calling card number to obtain telephone services is the theft of "property” under the larceny statutes (Penal Law §§ 155.25,155.30 [1]).
In resolving these two issues, I have examined the relevant statutory provisions and, guided by the rules of statutory interpretation, have concluded that the telephone calling card numbers defendants are charged with possessing are not "property” that can be "possessed” within the meaning of the criminal possession statutes; nor do "telephone services” constitute "property” capable of being stolen under the larceny statutes. Therefore, the counts which charge the defendants with criminal possession of stolen property in the fourth degree, grand larceny in the fourth degree (Smith) and petit larceny (Tansey), must be dismissed.
FACTS
The evidence presented to the Grand Jury established, in essence, the following: The Office of General Services (OGS) is a division of the New York State government that supports various governmental operations. At the time of the alleged offenses, OGS maintained a telephone calling system — now *236 discontinued — enabling certain State employees, who were issued cards bearing a six-digit authorization code, to place business-related phone calls without cost to them. To access the system, the State employee first dialed an "800” phone number, entered the personal authorization code and made the telephone call, the cost of which was billed to the employee’s agency.
Among the employees who received these access codes were members of the State Police above the rank of Trooper. Tansey, a retired, high ranking veteran of the State Police, obtained several authorization codes issued to members of the State Police and, without authorization, used the numbers to place numerous telephone calls from various pay phones. The evidence also demonstrates that Smith, a high ranking member of the State Police, also obtained and used similar numbers, some of which were programmed into his home telephone or written down on pieces of paper, all of which were seized from his house pursuant to a search warrant.
As a result of these acts, defendants were indicted for, inter alia, criminal possession of stolen property in the fourth degree, based on two theories as set forth in each indictment: first, that the stolen property possessed, specifically, several individual telephone credit card authorization codes for the New York State Office of General Services telephone calling card system, had an aggregate value in excess of $1,000 (Penal Law § 165.45 [1]). Second, that the property possessed consisted of a credit card (Penal Law § 165.45 [2]), specifically, the individual "telephone credit card authorization code[s]”. Additionally, there is a single count of grand larceny in the fourth degree (Penal Law § 155.30 [1]) against Smith and one count of petit larceny (Penal Law § 155.25) against Tansey, which as set forth in their respective indictments, allege that each stole "telephone service” provided by OGS.
POSSESSION OF STOLEN TELEPHONE CALLING CARD NUMBERS
Defendants’ primary contention is that knowledge of these telephone authorization codes, without possession of the actual card, is not "tangible property” and, therefore, does not fall within the ambit of criminal possession of stolen property as that crime is defined in the Penal Law.
Penal Law § 165.45 (1) and (2) provides:
"A person is guilty of criminal possession of stolen property in the fourth degree when he knowingly possesses stolen *237 property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof, and when:
"1. The value of the property exceeds one thousand dollars; or
"2. The property consists of a credit card or debit card.”
As an element of this crime, the People are required to show that the defendant had possession of the stolen property. The Penal Law states that to possess "means to have physical possession or otherwise to exercise dominion or control over tangible property. ” (Penal Law § 10.00 [8] [emphasis supplied].)
Property is given a specific meaning for purposes of the theft-related offenses contained in title J of the Penal Law, which title includes larceny and criminal possession of stolen property; it is defined as "any money, personal property, real property, computer data, computer program, thing in action, evidence of debt or contract, or any article, substance or thing of value including any gas, steam, water or electricity, which is provided for a charge or compensation.” (Penal Law § 155.00 [1].)
The statutory definition of "possess” and "property,” read together, clearly indicate that the Legislature, by virtue of its express command that only "tangible property” can be possessed, has qualified the kind of property that can be the subject of a possessory crime, absent specific inclusion otherwise. Although the Penal Law does not define the term "tangible,” when interpreting what a criminal statute means, the words in the statute must be given their "usual, ordinary and commonly accepted meaning” (McKinney’s Cons Laws of NY, Book 1, Statutes § 271 [c]). As defined in Black’s Law Dictionary on page 1456 (6th ed 1990), tangible means: "[having or possessing physical form. Capable of being touched and seen; perceptible to the touch; tactile; palpable; capable of being possessed or realized; readily apprehensible by the mind; real; substantial.” As defined in the Random House Dictionary of the English Language (2d ed 1987), it means: "capable of being touched; discernible by the touch; material or substantial”. Thus, under a common-usage reading of the relevant statutes, the absence of an allegation that defendants possessed property that is physical or corporeal in form, would appear to resolve the issue in favor of defendants. And in this regard, the People do not dispute that there is no allegation, nor any evidence before the Grand Jury that defendants had *238 possession of the actual telephone calling card or any other stolen physical material. Nor do they controvert defendants’ contention that the mere knowledge of these codes is intangible.
The People, however, argue that the defendants’ conduct falls within the scope of the criminal possession statutes, and in support of their position, they cite People v Johnson (148 Misc 2d 103 [Grim Ct, NY County 1990]), which on somewhat similar facts sustained a criminal possession charge, expressly rejecting People v Molina (145 Misc 2d 612 [Crim Ct, Queens County 1989]), the only other reported decision on point.
Both the Johnson and Molina courts considered whether a charge of criminal possession of stolen property in the fifth degree was sustainable upon an allegation that the defendant possessed pieces of paper, on or near his person, bearing AT&T calling card numbers. In finding that it was not, Molina (supra) considered the Penal Law definition of possess and found that without possession of the actual card, the possession element of this offense was not satisfied. The court reasoned that "[s]ince the numbers in and of themselves are not tangible property,” the numbers are not capable of being possessed within the meaning of the statute (People v Molina, supra, at 615). In reaching the opposite conclusion, Johnson (supra) expressly rejected Molina, finding that, since the number itself "has inherent value”, there is little "relevance to the form in which the telephone credit card number is possessed.” (People v Johnson, supra, at 110.)
In urging me to follow Johnson (supra), the People contend that "too much emphasis should not be placed on the word tangible since the definition of property in the [l]arceny and [s]tolen [p]roperty [statutes includes intangible property.” They maintain that the inherent value of the OGS authorization code, without the card, brings the mere knowledge of the number within the definition of property, and thus, their argument runs, if it is property, then regardless of its nature or form, it can be criminally possessed. They also argue that it would defy logic to hold that defendants’ conduct does not fall within the scope of the criminal possession statute, since, they claim, those who engage in such activity would be permitted to escape criminal liability. Implicit in these contentions is that the presence of the word tangible in the statutory definition of possess can be either overlooked or construed contrary to its common meaning. Or, in other words, that the statute does not mean what it says.
*239 The provisions of the Penal Law are to be interpreted "according to the fair import of their terms so that penal responsibility is not extended beyond the fair scope of the statutory mandate” (People v Harper, 75 NY2d 313, 318 [1990]; see, Penal Law § 5.00). Moreover, it is a basic rule of statutory interpretation that the meaning of a statute is to be found by looking to the underlying legislative intent, which is determined by the very language used by the Legislature, given its ordinary meaning (McKinney’s Cons Laws of NY, Book 1, Statutes § 272). When that language is clear and unambiguous, it is inappropriate for a court to look any further "into what at times is an ill-defined legislative intent” for the purpose of giving the statute a different meaning (People v Graham, 55 NY2d 144,151 [1982]).
The language at issue here is "tangible property,” as it appears within the statutory definition of "possess” which is contained in section 10.00 of the Penal Law. That section provides a list of definitions for certain terms which appear throughout the Penal Law, which definitions are inapplicable only where a different meaning is expressly specified in another provision. Though that is clearly not the case here, the People ask me, in effect, to disregard the word tangible since, they claim, the definition of "property,” in Penal Law § 155.00 (1), expressly includes intangibles such as "thing[s] of value” and "computer data”. To be sure, the term property has been construed expansively by the Court of Appeals, at least as it relates to larceny by extortion, to include intangible rights of inherent value (see, People v Garland, 69 NY2d 144 [1987] [legal right to occupy and possess an apartment]; People v Spatarella, 34 NY2d 157 [1974] [advantageous business relationship]). As the Court stated in Spatarella, such property rights or interests are the "sort of property which can be demanded under pain of injury * * * within the contemplation of the statute.” (Supra, at 162.) In neither Spatarella nor Garland did the Court suggest that this view of property would be applicable to larceny by means other than extortion, or to a possession offense.
In any event, even assuming that the mere knowledge of a telephone authorization code could be considered "property” for purposes of the larceny statutes, that would still not permit me to ignore the presence of the word "tangible” in the statutory definition of possess, which is found in a separate Penal Law section. To the contrary, the unambiguous wording of section 165.45, read in conjunction with section *240 10.00 (8), makes clear that the possession of such intangible telephone authorization codes has not yet been designated a crime by the Legislature.
That this reading of the statute is correct, is underscored by examination of the accompanying Commission Staff Notes to the revised Penal Law, wherein the crime of criminal possession of stolen property was created as a new offense. Its predecessor statute was referred to as "buying, receiving, concealing or withholding” stolen property (former Penal Law § 1308). Since "the essence” of each of these acts was "possessing” stolen property, this new crime was created to expressly proscribe possession of such property (Commn Staff Notes, reprinted in Proposed NY Penal Law [Study Bill, 1964 Senate Int 3918, Assembly Int 5376] §§ 170.40, 170.45, 170.50, at 358, now Penal Law §§ 165.40, 165.45, 165.50, 165.52, 165.54). According to the revisers of the Penal Law, "the gravamen of the crime is the illegal possession”, the definition of which, as was pointed out, included the term "tangible * * * property” (ibid,.). The revisers also noted that this definition of possession also would expressly encompass constructive possession, which the Court of Appeals, in People v Fein (292 NY 10 [1944]), held was not proscribable conduct under the predecessor statute to Penal Law § 165.45 (former Penal Law § 1308), absent statutory authorization. In this regard, if the Legislature wanted also to proscribe the possession of property, regardless of its form, it certainly knew how to do so. Since they did not, and since the Legislature has not otherwise indicated that a different meaning applies, I must give effect to the plain and commonly understood meaning of "tangible property.”
I recognize, of course, that the value of the telephone calling card is not necessarily in the actual card but rather exists in the number itself. Certainly, a person who obtains such a number without the consent of the authorized user and either commits it to memory or writes it down on a piece of paper is in a position to reap the benefits of the access code by its unauthorized use. Nevertheless, the mere knowledge of the code does not constitute a crime under the statute. And contrary to the People’s assertion that this conclusion would allow such conduct to go unpunished, it is evident that the conduct alleged here falls squarely within the statute proscribing theft of services (Penal Law § 165.15). While the People may believe that such activity should be dealt with more *241 severely, that is quintessentially a legislative, and not a judicial, determination.
Interestingly, the Legislature recently had the opportunity to increase the level of the crime pertaining to this conduct when, in order to "strengthen the prosecution for the theft, sale and use of stolen telephone calling card numbers”, since "some courts have required the possession of the actual credit card plate (see, People v. Molina; but see, People v. Johnson)”, it amended the Penal Law to proscribe the theft and use of an "access device” (Assembly Mem, Bill Jacket, L 1992, ch 491). This new statute defines an "access device” as "any telephone calling card number, credit card number, account number or personal identification number that can be used to obtain telephone service.” (Penal Law § 155.00 [7-c], added by L 1992, ch 491, § 1, eff Nov. 1, 1992.) In remedying the perceived problem, the Legislature amended the crimes of grand larceny in the fourth degree (Penal Law § 155.30), theft of services (Penal Law § 165.15) and scheme to defraud in the second degree (Penal Law § 190.60), all nonpossessory crimes, to include such telephone access device. The Legislature did not, however, make it a crime to possess a stolen access device, which it could well have done. In my view, this recent legislation buttresses the conclusion that the crime of criminal possession of stolen property does not reach the OGS access code.
Having concluded that the absence of an allegation that defendants possessed tangible property requires that I dismiss the counts charging defendants with criminal possession of stolen property in the fourth degree, it is not necessary to decide the defendants’ alternative claim that an OGS access code is not a "credit card” within the meaning of Penal Law § 165.45 (2) and General Business Law § 511.
THE THEFT OF TELEPHONE SERVICES
Each defendant is also charged with the larceny of telephone services. Since the crimes, as set forth in the indictment, do not constitute either petit larceny (Penal Law § 155.25) or grand larceny in the fourth degree (Penal Law § 155.30 [1]), these counts must also be dismissed.
The indictments specifically charge that the defendants committed a larceny involving the theft of "telephone services” which I do not believe is "property” that can be the subject of a larceny, but rather is expressly subject to prosecu *242 tion only under section 165.15 of the Penal Law, which proscribes the theft of services.
For purposes of the theft-related crimes contained in title J, in which title the crime of larceny is situated, it is quite clear that certain designated commodities supplied through a service constitute property which is subject to the larceny statutes. However, the supplying of the particular commodity, i.e., the service, is not property that can be the subject of a larceny. This property/services dichotomy is made evident by the comments of the revisers of the Penal Law who stated that ”[s]ince 'services’ are not 'property,’ 'theft’ of a service does not constitute larceny; and, if any such conduct is to be proscribed, it must be by special statute.” (Commn Staff Notes, reprinted in Proposed NY Penal Law [Study Bill, 1964 Senate Int 3918, Assembly Int 5376] § 170.20, at 356, now Penal Law § 165.15.) This is reiterated in the Practice Commentary to section 165.15 which states that "[s]ince a 'service’ * * * is generally not considered 'property,’ and a theft of a service would not therefore constitute larceny”, the crime of theft of services was devised to proscribe such thefts (Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 165.15, at 241 [emphasis supplied]).
Also reflecting this property/service dichotomy, is that the terms "property” and "service” are defined separately in section 155.00 of the Penal Law. As the term "service” has consistently been defined, it includes, "but is not limited to, labor, professional service, a computer service, transportation service, the supplying of hotel accommodations, restaurant services, entertainment, the supplying of equipment for use, and the supplying of commodities of a public utility nature such as gas, electricity, steam and water” (Penal Law § 155.00 [8] [emphasis supplied]).[1] The original definition of property in the revised Penal Law did not include, as it does now, "gas, steam, water or electricity, which is provided for a charge or compensation.” (See, L 1978, ch 420, § 3.) But the 1978 amendment expanding the definition of property to include these commodities did not affect the original property/service dichotomy, since the amendment was in response to judicial decisions holding that the commodities themselves are property which is capable of being appropriated. (See, e.g., People v Neiss, 73 AD2d 938 [2d Dept 1980] [gas]; People v Robinson, 97 *243 Misc 2d 47 [Sup Ct, Kings County 1978] [gas]; People v McLaughlin, 93 Misc 2d 980 [Sup Ct, Queens County 1978] [electricity].) Notably absent from this amended definition of property was the inclusion of telephone services. Also absent was any legislative expression that the act of supplying such services was to be equated with property for purposes of the larceny statutes.
Thus, even if there is an identifiable product supplied by telephone services, such as is the case with gas, steam, water and electricity, here it is not alleged that defendants stole any such thing; rather they are charged with the theft of telephone services, which remains proscribed not under section 155.25 or section 155.30, but rather under section 165.15 (4), which specifically provides: "A person is guilty of theft of services when * * * [w]ith intent to avoid payment by himself or another person of the lawful charge for any telecommunications service, including * * * telephone service * * * he obtains * * * such service * * * by means of * * * artifice, trick, deception, code or device.”
Consequently, since the counts charging defendant Smith with grand larceny and defendant Tansey with petit larceny fail to make out an essential element of the crime, i.e., the theft of "property,” these counts must be dismissed.
DEFRAUDING THE GOVERNMENT
Defendant Smith is also charged separately with a single count of defrauding the government, in violation of Penal Law § 195.20.[2] While the conduct alleged under this count is the same as that underlying the larceny count, i.e., that he obtained "telephone services,” the crime of defrauding the government is contained in a different title of the Penal Law, which title does not define property. At issue then is whether the Penal Law’s property/services distinction, applicable to *244 title J offenses, is applicable as well to this statute. In view of the structure of the Penal Law, and the underlying purpose of section 195.20, I conclude that it is not, and further conclude that telephone services provided by the OGS calling card system is "property” within the meaning of the crime of defrauding the government.
Title L, entitled "Offenses Against Public Administration”, in which the crime of defrauding the government is contained, neither defines property, nor does it erect the property and services dichotomy, as does title J, pertaining to "Offenses Involving Theft”. Thus, since title J specifies that its definitions are "applicable to this title” (§ 155.00), the statutory scheme alone is enough to warrant the conclusion that a similar statutory property/services distinction simply does not apply to the crime of defrauding the government, under title L.
Moreover, it is quite clear that the telephone services which Smith allegedly stole from the government fall within the meaning of property. As defined in the General Construction Law, property means "real and personal property”, and personal property includes "everything, except real property, which may be the subject of ownership”. (General Construction Law §§ 38, 39.) These services also fall within the commonly understood meaning of property which is "[t]hat dominion or indefinite right of use or disposition which one may lawfully exercise over particular things or subjects” as well as "[t]he exclusive right of possessing, enjoying, and disposing of a thing” (Black’s Law Dictionary 1216 [6th ed 1990]). Here, the evidence before the Grand Jury established that Smith fraudulently obtained telephone services valued in excess of $1,000 from the State government. OGS contracted with, and paid, private vendors in order to provide such services to certain State employees. That the use of such services, without any cost to Smith, was something of value cannot be disputed. Nor can it be disputed that the government had the exclusive right of disposing of these services as it saw fit. Consequently, I find that the telephone services obtained by Smith constitutes "property” within the meaning of Penal Law § 195.20.
To hold that valuable government services is property that can be the subject of defrauding the government but not the subject of larceny crimes, might, on a superficial level, appear to be arbitrary and inconsistent. However, such a distinction is not only warranted by the statutory scheme, but also finds *245 support in the very purpose underlying the enactment of the crime of defrauding the government.
Defrauding the government was modeled after the crime of scheme to defraud (Penal Law §§ 190.60, 190.65), contained in title K, the gravamen of which is the fraudulent and "nefarious character of the scheme rather than the dollar loss of the victims” (People v Palmer, 108 AD2d 545, 546 [3d Dept 1985]). This new crime was added to the Penal Law in 1986 (L 1986, ch 833, § 1), in response to rising concerns about corruption in public office. It is aimed at those who abuse their position by violating the public trust for personal gain and, thus, undermine the integrity of government. Underlying the enactment of this crime was the recognition that "[s]chemes to defraud the government, especially those created by individuals with inside knowledge of how particular governmental agencies operate, frequently result in the loss or diversion of significant amounts of public funds.” (Governor’s Mem, 1986 NY Legis Ann, at 342.) Notably, the specific purpose of the act was to address the serious problem of the corruption of public officials by making such conduct punishable as a felony, thereby exposing those who abuse their position to severe penal sanctions (ibid.).
In contrast to the theft-related offenses contained in title J, there is no indication that the Legislature, in enacting the crime of defrauding the government, chose to exclude valuable government services from the kind of "property” that can be fraudulently obtained by a public servant under this section. Moreover, to engraft a similar property/service distinction onto this section would serve to frustrate the purposes of the statute, i.e., to criminally punish those who abuse their public office for personal gain or benefit, at the expense of the government and its citizenry. As the evidence before the Grand Jury amply demonstrates, that is exactly what this high ranking member of the State Police allegedly did — the evidence shows that Smith abused his position by using inside knowledge, attained by virtue of his trusted position, to defraud New York State of property valued in excess of $1,000. Accordingly, I am satisfied that the evidence before the Grand Jury is legally sufficient to sustain count one of Smith’s indictment and the motion to dismiss this count is denied.
DIVULGING AN EAVESDROPPING WARRANT
Defendant Tansey also urges that I dismiss two counts *246 charging him with divulging an eavesdropping warrant (Penal Law § 250.20), claiming that the statute is facially unconstitutional as vague and overbroad, under the First and Fourteenth Amendments of the United States Constitution. Additionally, he contends that, even if facially valid, the statute is unconstitutional as applied to him.
Penal Law § 250.20, in pertinent part, provides: "A person is guilty of divulging an eavesdropping warrant when, possessing information concerning the existence or content of an eavesdropping warrant issued pursuant to article seven hundred of the criminal procedure law, or concerning any circumstances attending an application for such a warrant, he discloses such information to another person.” (The statute delineates the disclosures which are authorized under this section.)
The activity for which Tansey claims the protection of the First Amendment can be quickly summarized. The People claim that Tansey disclosed the existence of an eavesdropping device to the target of an ongoing criminal investigation into suspected criminal activity at the Jacob Javits Convention Center. It is specifically alleged that Tansey possessed information concerning the existence of an eavesdropping warrant, issued pursuant to CPL article 700, authorizing the interception of oral communications within the Teamsters Union, Local 807 office, located in the Javits Center. Count one charges that he disclosed this information to Robert Rabbitt, Sr., the target of the eavesdropping order and, under count two, it is alleged that this information was disclosed to a confidential government informant. The People also contend that Tansey acquired this information directly from his State Police contacts and then "transmitted the information directly to the main target with the clear intent of foiling the investigation”, ultimately accomplishing that goal.
The Grand Jury evidence demonstrates that on May 6, 1990, the confidential informant referred to in count two, was told by Robert Rabbitt, Sr., the target of the investigation, that his office and phone were "bugged.” Then, when the confidential informant mentioned to Tansey that there was a bug in the Local 807 office, Tansey responded, "yeah * * * I got information from a friend of mine, State Police that they got the bug in there * * * that there was swag in there and that’s how they got the bug.” When Tansey was asked how he found this out, he said "I have people that owe me a thousand and one favors” and that his "friend from the State Police” told him they just renewed the "bug”.
*247 Initially, I note that the disclosure to Robert Rabbitt, Sr., charged under count one, clearly falls within the facial scope of the statute. However, the statement to the confidential informant, as charged under count two, does not fall within the proscription of Penal Law § 250.20. A "disclosure”, though not statutorily defined, is a "[r]evelation; the impartation of that which is secret or not fully understood.” (Black’s Law Dictionary 464 [6th ed 1990].) Here, the evidence before the Grand Jury establishes that Tansey made no such revelation to the confidential informant as it was the informant who first brought the matter to Tansey’s attention, not the other way around. Thus Tansey’s response was not a "disclosure” within the meaning of the statute.
Tansey’s disclosure to Rabbitt, alleged under count one, however, falls within Penal Law § 250.20, but since the statute, by its very terms, places a restriction on speech, Tansey contends that it raises First Amendment concerns. First, is that the statute unconstitutionally sweeps too broadly, prohibiting all such disclosures, regardless of who makes the disclosure or to whom it is made. And second, is that the statute, if not facially invalid, is unconstitutional as applied to him since, as a private citizen with no official connection to the eavesdropping proceedings, his disclosure to the target of the eavesdropping order is constitutionally protected speech.
It is fundamental that the First Amendment guarantee of free speech, though broad in its protection of expression is not absolute and may give way when substantial interests are at stake (see, e.g., Feiner v New York, 340 US 315 [1951]). Indeed, the United States Supreme Court has time and again permitted restrictions upon certain limited areas of speech which are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality” (Chaplinsky v New Hampshire, 315 US 568, 572 [1942] ["fighting words”]; see, e.g., New York Times Co. v Sullivan, 376 US 254 [1964] [defamation]; Miller v California, 413 US 15 [1973] [obscenity]; New York v Ferber, 458 US 747 [1982] [child pornography]).
With regard to the statute at issue, the Supreme Court set forth the applicable constitutional standards in Landmark Communications v Virginia (435 US 829 [1978]), where a Virginia statute criminalizing the disclosure of confidential information was challenged. In Landmark, a newspaper publisher was convicted under State law for divulging information *248 pertaining to proceedings before a State judicial review commission. The precise question before the Court was "whether the First Amendment permits the criminal punishment of third persons who are strangers to the inquiry, including the news media, for divulging or publishing truthful information regarding confidential proceedings of the Judicial Inquiry and Review Commission.” (Supra, at 837.) In holding that it did not, the Court found that the asserted interests underlying the statute, i.e., protecting the reputation of Judges and maintaining the integrity of the courts, were insufficient to justify the resulting interference with speech. In weighing the competing interests, the Court stressed that the publication of information regarding "[t]he operations of the courts and the judicial conduct of judges [which] are matters of utmost public concern” (supra, at 839), "lies near the core of the First Amendment” (supra, at 838).
Here, I must also balance Tansey’s asserted First Amendment rights against the State’s asserted interest in the nondisclosure of eavesdropping warrant proceedings. In doing so, I recognize that while Landmark (supra) frames the relevant inquiry, its holding is a narrow one that can by no means be read to foreclose punishment for disclosing important confidential information under other, more compelling circumstances, such as those present in the instant case.
There can be little doubt that eavesdropping is an important technique employed by law enforcement in investigating, uncovering and combating crime, and which is carefully regulated by CPL article 700.00 et seq., which contains a comprehensive scheme for the issuance of eavesdropping warrants. To obtain such a warrant, section 700.15 (4) erects a high threshold requiring both probable cause and a showing "that normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ.”
While review of the legislative history of Penal Law § 250.20 provides no express statement of the purpose behind its enactment, its self-evident purpose "is to assure the secrecy of an eavesdropping warrant issued by a court * * * by proscribing disclosure of the warrant except as expressly permitted” (Donnino, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 250.20, at 322).While review of the legislative history of Penal Law § 250.20 provides no express statement of the purpose behind its enactment, its self-evident purpose "is to assure the secrecy of an eavesdropping warrant issued by a court * * * by proscribing disclosure of the warrant except as expressly permitted” (Donnino, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 250.20, at 322).[3] Also self-evident is *249 the State’s interest in maintaining secrecy; the eavesdropping application is made ex parte and both its value and effectiveness are lost when its existence is divulged to the target.
That such disclosures pose a serious and real threat to investigations that rely upon eavesdropping as the only means likely to uncover criminal activity was made all too apparent here, where Tansey’s alleged disclosure to the target of the investigation, according to the People, caused a "large scale racketeering investigation” to "grind to a halt.”
As readily apparent as the importance of maintaining the confidentiality of such proceedings is the minimal nature of the First Amendment interest being asserted here, an interest that stands in a stark contrast to the type of interest asserted in Landmark (supra). While it is difficult to precisely qualify the value of different types of expression, the disclosure alleged here — one made by one individual to another for no purpose except that of obstructing eavesdropping authorized for the purpose of investigating ongoing criminal activity —is of such slight social value that it has little to do with the exchange of ideas and the free flow of information that the First Amendment traditionally protects. It can hardly be disputed such interest also falls far short of the kind of "core expression” present in Landmark. Certainly, as the statute is applied against Tansey, it is directed not towards the expression of ideas, but rather towards the purposeful attempt to obstruct a lawful governmental eavesdropping operation. It seems evident that Tansey’s interest in such expression is exceedingly minimal, when compared to the public interest in preserving the effectiveness and integrity of the court-authorized eavesdropping.
Having concluded that Tansey himself may have engaged in expression which is not constitutionally protected does not end the inquiry. When a statute regulates speech, given the potential it has to chill protected expression if too broadly drawn, one whose own conduct is not protected may still challenge the statute for overbreadth (see, Gooding v Wilson, 405 US 518 [1972]; New York v Ferber, 458 US 747 [1982], supra). But, where the application of a statute is constitutionally sound, it should not be invalidated on overbreadth grounds unless it penalizes a substantial amount of protected speech, and there is no reasonable means of constitutionally narrowing the statute (see, New York v Ferber, supra).
At first blush, under a literal reading of section 250.20, it *250 would appear that any disclosure regarding an eavesdropping warrant is subject to prosecution. If that were the case, it would not be difficult to conceive of the statute’s potential to punish individuals for casually making reference to such matters, no matter how innocent or harmless. While the statute’s theoretical potential to threaten a substantial amount of free expression that could hardly advance any State interest, let alone a substantial one, would in all likelihood render it impermissibly overbroad, I am mindful that a statute should not be declared unconstitutional if it is possible to read it in harmony with the Constitution (see, People v Epton, 19 NY2d 496, 505 [1967], cert denied 390 US 29 [1968]; McKinney’s Cons Laws of NY, Book 1, Statutes § 150). In other words, constitutional limitations are implicit in every statute unless the statute, either expressly or by necessary implication, commands otherwise.
A sound application of these principles requires that I examine whether section 250.20 is susceptible of a constitutionally sound construction; one that is implicit in its language and manifest purpose. In this regard, requiring that the disclosures which the statute proscribes to be narrowly read so that the phrase "discloses such information” targets only disclosures made in order to obstruct, impede, or prevent such interception, would be consistent with the manifest purpose of the statute and would maintain its effectiveness. Construed as such, the statute would be clearly and narrowly directed towards the kind of constitutionally prescribable expression with which Tansey has been charged. And, while one might conceive of some possible impermissible applications of the statute, I am satisfied that this reading of the statute would make any imagined threat to First Amendment values neither real nor substantial when judged in relation to the statute’s legitimate reach; it would not be impermissibly overbroad. (See the analogous Federal statute [18 USC § 2232 (c)], which explicitly sets forth such a requirement.)
It should be noted that in construing section 250.20, so that it is in accord with constitutional principles, I am applying the analytical framework mandated by the Court of Appeals. For example, in both People v Epton (supra) and in Matter of Bell v Waterfront Commn. (20 NY2d 54 [1967]), the Court incorporated constitutional limitations into statutes that regulated expression. In Epton, the Court read into the criminal anarchy statute a requirement "[t]he advocacy of the overthrow of the Government by force and violence must be *251 accompanied by an intent to accomplish the overthrow” and that the utterance create a " 'clear and present’ ” danger of its attempt or accomplishment, thereby harmonizing the statute with then-recent developments in First Amendment law (People v Epton, supra, at 506). Likewise, in Bell, the Court examined the Waterfront Commission Act and construed the clause " 'knowingly or willingly advocates the desirability of overthrowing the government of the United States by force or violence,’ to proscribe only that type of advocacy (1) which is intended to indoctrinate or incite to action in furtherance of the defined doctrine and (2) which is accompanied by a 'clear and present danger’ of success.” (Matter of Bell v Waterfront Commn., supra, at 62.)
I decline to follow the only reported case on this issue, People ex rel. Serra v Warden (90 Misc 2d 654 [Sup Ct, Bronx County 1977]), which held section 250.20 unconstitutional as applied to defendant, a non-State employee, but refused to strike the statute as facially invalid. Serra held that section 250.20 could be constitutionally saved by construing it as proscribing disclosures made by a certain class of citizens, such as State employees connected to the proceedings. In so limiting the statute, Serra reasoned that "[i]t is obvious * * * that an employee or official whose occupation makes him privy to governmental secrets, can do inestimable damage by disclosing such information.” (Supra, at 659.) In my view, it is also self-evident that a person who is not a public employee, but who is able to obtain this type of confidential information and thereafter sets out to divulge it for the purpose of obstructing the eavesdropping order, is equally capable of inestimable damage. Indeed, this case illustrates why adopting a public employee/private citizen distinction would do little to protect against the harms even recognized in Serra as a legitimate State concern. Here, Tansey, formerly employed by the State Police for 26 years, still maintained his State Police contacts and apparently obtained his information directly from one of these contacts. What is significant is not Tansey’s employment status at the time of his actions, but rather that he obtained this information and then passed it on to the target and compromised an ongoing criminal investigation. By proscribing only these disclosures that are made for the express purpose of obstructing the court-authorized eavesdropping, the State interest is sufficiently compelling to override any First Amendment concerns.
Finally, defendant claims, without any elaboration, that the *252 statute is unconstitutionally vague. I disagree. A statute is void for vagueness only if a person of common intelligence must guess at the statute’s meaning and the statute fails to provide sufficient notice of what exactly is prohibited. (Broadrick v Oklahoma, 413 US 601 [1973].) Extended discussion is not necessary for the conclusion that section 250.20, as construed, provides a person of common intelligence with fair warning of what conduct is proscribed.
THE SEARCH WARRANTS
Defendants Smith and Tansey also controvert search warrants authorizing the police to search, respectively, Smith’s residence and Tansey’s person and automobile. I have examined the affidavit in support of the search warrants, and am satisfied that there was sufficient information to establish a "reasonable belief’ that the specified items sought, evidence of a crime, would be found in the places designated to be searched (see, People v Bigelow, 66 NY2d 417, 423 [1985]). Additionally, defendant Tansey fails to set forth any legal grounds or factual allegations in support of his motion for a hearing to challenge the search warrant, pursuant to Franks v Delaware (438 US 154 [1978]). Therefore, the motions are denied.

. Computer service was added to this definition by amendment in 1986 (L 1986, ch 514, § 3).

. Penal Law § 195.20 provides:
"A person is guilty of defrauding the government when, being a public servant or party officer, he:
"(a) engages in a scheme constituting a systematic ongoing course of conduct with intent to defraud the state or political subdivision of the state or a governmental instrumentality within the state or to obtain property from the state or a political subdivision of the state or a governmental instrumentality within the state by false or fraudulent pretenses, representations or promises and
"(b) so obtains property with a value in excess of one thousand dollars from such state, political subdivision or governmental instrumentality.”

. The predecessor statute to Penal Law § 250.20, former Penal Law § 745, was added to the Penal Law in 1957 (L 1957, ch 881).