[983 NYS2d 534]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SCOTT BARDEN, Appellant.

First Department, April 10, 2014

## APPEARANCES OF COUNSEL

*Office of the Appellate Defender*, New York City (*Richard M. Greenberg* of counsel), for appellant.

*Cyrus R. Vance, Jr., District Attorney*, New York City (*David E.A. Crowley* and *Alice Wiseman* of counsel), for respondent.

### OPINION OF THE COURT

Acosta, J.

This appeal raises questions about the elements of identity theft and whether intangible property can be criminally pos-

sessed, where a defendant used his associate's credit card number to pay for hotel expenses without authorization. Specifically, we are called upon to determine, first, whether assumption of identity is a discrete element of identity theft or whether it occurs automatically when a person uses another's personal identifying information, and second, whether criminal possession of stolen property includes intangible property, namely a credit card number. Regarding the first issue, we find that to secure a conviction for identity theft the People must prove not only that a defendant used another's personal identifying information, but that he or she consequently assumed the identity of that person. Because the hotel was aware of defendant's identity, he did not assume the identity of his associate by charging the credit card and, accordingly, the evidence was legally insufficient to support his conviction of identity theft. As to the second issue, we have determined that the legislature intended intangibles, including credit card numbers, to fall within the ambit of criminal possession of stolen property. Defendant constructively possessed his associate's stolen credit card number, and thus he was properly convicted of the latter offense.

I. Background

In or around March 2009, defendant met businessman Anthony Catalfamo and began to assist him in a business venture by seeking potential investors for a development project in the Bahamas. On at least three occasions between that time and February 2010, Catalfamo paid for defendant to stay in hotels, pursuant to third-party billing agreements, in order to facilitate defendant's work on the project. Those agreements required Catalfamo to supply his credit card information to the hotels, and they established duration and expense limits on the hotels' permission to charge the account.

In February 2010, Catalfamo and defendant agreed that Catalfamo would cover the expenses of defendant's stay at the Thompson LES Hotel (the hotel) in Manhattan, anticipating that defendant would soon strike a deal with prospective investors. They further agreed that defendant would stay at the hotel for approximately five days and that his expenses would be limited to $2,300. Catalfamo entered into a third-party billing agreement with the hotel, intending that defendant would stay for the nights of February 12 through February 16.

When defendant checked into the hotel on February 13, 2010, at around 2:00 a.m., he told a front-desk staff member, Vanessa

Vega, that his company was paying for his stay and that he did not want the charges to exceed $2,300. Vega prepared the third-party billing agreement and wrote on it the words "Total authorized charges not to exceed $2,300." After defendant reviewed and approved the form, Vega scanned and emailed it to Catalfamo.

Upon receipt of the form, Catalfamo called the hotel and spoke with an assistant front-desk manager, Craig Weber, to ensure that the hotel would abide by the $2,300 limit. Catalfamo then completed the form, providing his American Express card number, the card's expiration date, and his signature. On the agreement, Catalfamo wrote the phrases "This Transaction Agreement is for *one* swipe *one* charge ONLY!" and "No additional payment will be authorized with this card." Catalfamo returned the form to the hotel, and Weber wrote on the agreement "$2,300 authorized on 2/12/10 for account of Bane Barden [another name by which defendant was known]."

When the hotel processed the third-party billing agreement, Catalfamo's credit card information—but *not* his name—became "attached to [defendant's] profile" on the hotel's computer system. However, due to an error on the part of the hotel, the third-party billing agreement did not attach to defendant's computer profile. Whenever hotel employees subsequently accessed defendant's profile, they would see that he previously used an American Express card ending in four specific digits, but they were unable to see Catalfamo's name, the billing agreement, or the $2,300 limit. At no point did Catalfamo authorize the hotel to charge his credit card account beyond the terms of this initial agreement, nor did he provide his credit card information directly to defendant.

Defendant stayed at the hotel for five nights and checked out on February 17th, incurring charges slightly in excess of the specified limit, and the hotel charged the full amount to Catalfamo's American Express card. The extent of excess charges to Catalfamo's credit card did not end there, however. Because of another mistake on the hotel's part, Catalfamo's credit card information was not deleted from defendant's computer profile upon his departure. The result was a slew of substantial unauthorized charges.

A reservation at the hotel was made in defendant's name for the night of February 28, 2010. On March 1, 2010, when defendant had not checked in, the hotel charged $205.41 to Catalfamo's credit card, because that was the payment method that

was still linked to defendant's computer profile from his earlier stay. The evidence at trial did not explain how that reservation was made.

By mid-March 2010, defendant's business relationship with Catalfamo soured. Catalfamo indicated that he no longer wished to fund defendant's expenses because the Bahamas project had not made sufficient progress. Nonetheless, defendant arrived at the hotel on March 24, 2010, and, according to Vega's trial testimony, told Vega to charge the American Express card on file. Vega routinely dealt with third-party agreements, so she did not recall the expired agreement with Catalfamo. She simply used Catalfamo's card, the only American Express card that was linked to defendant's hotel computer profile—although Catalfamo's name was not visible on the profile—and obtained approval for the charges from American Express.

Defendant checked out of the hotel on March 25 and settled the bill of nearly $2,000 with the same credit card. On checking out, defendant decided to extend his stay and immediately checked back in until March 27, incurring a bill of nearly $1,000, which the hotel also charged to Catalfamo's card. Defendant returned to the hotel on March 30. Again, Vega checked him in and defendant said she could bill the card "on file." This time, defendant stayed at the hotel for nearly six weeks, until his arrest. During this stay, Vega and Weber saw him "[a]t least every other day." Catalfamo's card remained the only account that was attached to defendant's computer profile. Defendant consistently directed the hotel staff to bill the American Express card "on file" or responded affirmatively when they asked whether they should bill the same card.

At some point during defendant's stay, Weber recalled the expired third-party billing agreement and confronted defendant about it. According to Weber's trial testimony to which neither party objected, defendant responded that he was authorized to use Catalfamo's American Express card for his post-February expenses. That statement, however, was untrue.

In April 2010, Catalfamo discovered the unauthorized charges, totaling more than $10,000, and reported them to American Express. On or about April 12, the hotel discovered that American Express had declined the post-February charges. The hotel was notified of a "chargeback," meaning that it did not receive payment for the unauthorized charges.

At that point, the hotel attempted unsuccessfully to reach defendant by phone in order to discuss the billing issues. Cather-

ine Angulo, the director of the hotel's front office, encountered defendant at the front desk and asked for an alternate method of payment. She mentioned that the hotel had a "Visa card on file" and, without providing details, asked if defendant wanted her to charge that card. Defendant answered in the affirmative, and that was the extent of their conversation. That Visa card, however, belonged to Mark Barden, a person who had no connection to defendant. Nevertheless, the hotel continued to charge defendant's expenses to Mark Barden's Visa card from April 12 to May 13, 2010.[1] Visa declined some of the charges on May 13, at which point the hotel became more aggressive in attempting to obtain payment from defendant. Hotel staff members called his room several times and attempted to confront him when he passed through the lobby, but defendant was consistently dismissive, claiming he was busy or that his accountant would handle it. At some point, defendant requested a new third-party billing agreement, and Angulo obliged.

On May 13, 2010, the hotel received a completed agreement from Joseph Rizzuti, Catalfamo's business associate who had initially introduced him to defendant. The authorization was declined, however, when the hotel attempted to charge the outstanding balance to Rizzuti's card on the morning of May 14. That same day, the hotel received notice from Visa stating that the company was declining all prior charges made to Mark Barden's account between April and May. Consequently, after the "chargebacks" from the credit cards of Catalfamo and Mark Barden, the hotel had not received payment for approximately $50,000 worth of charges that defendant had incurred between March and May. Several hours later, on May 14, Angulo called the police, and defendant was arrested.

After a jury trial, defendant was convicted of identity theft in the first degree, criminal possession of stolen property in the fourth degree, and two counts of theft of services. He was sentenced to concurrent terms of 2⅓ years to 7 years for identity theft, 1⅓ to 4 years for possession of stolen property, and one year for each theft of services count. Defendant now appeals, arguing that the evidence was legally insufficient to support his convictions for identity theft, possession of stolen property, and one count of theft of services (Penal Law § 165.15 [1]). He further argues that his statutory rights to a speedy trial were violated. For the reasons set forth below, we vacate the

---

1. Defendant's conviction of identity theft was based on his use of Catalfamo's, not Mark Barden's, credit card information.

conviction of identity theft and affirm the remaining convictions.

II. Discussion

A. Identity Theft

First, although inartfully phrased, defendant's objection at trial preserved his argument that his conduct did not amount to identity theft because the People failed to prove that he assumed another's identity. In any event, to the extent his argument may not have been preserved, we reach it in the interest of justice.

A person commits identity theft in the first degree

> "when he or she knowingly and with intent to defraud assumes the identity of another person by presenting himself or herself as that other person, or by acting as that other person or by using personal identifying information of that other person, and thereby . . . obtains goods . . . or services or uses credit in the name of such other person in an aggregate amount that exceeds two thousand dollars" (Penal Law § 190.80 [1]).

There are, accordingly, three methods by which an individual can assume another's identity under the statute: a defendant might (1) present himself or herself as another, (2) act as another, or (3) use the *personal identifying information of another.*

The parties agree that a person must assume the identity of another in order to be guilty of identity theft. Where the parties differ is on the question of whether engaging in one of the statute's enumerated methods—here, using another's personal identifying information in the form of a credit card account number—necessarily constitutes an assumption of identity. In other words, is assumption of identity a discrete element of the statute that must be proven independently of one of the methods by which identity can be assumed, or do the People automatically prove assumption of identity by proving that a defendant used another's personal identifying information? This question requires us to refer to the canons of statutory interpretation.

"The governing rule of statutory construction is that courts are obliged to interpret a statute to effectuate the intent of the [l]egislature, and when the statutory language is clear and unambiguous, it should be construed so as to give effect to the plain meaning of [the] words used" (*People v Finnegan*, 85 NY2d

53, 58 [1995], *cert denied* 516 US 919 [1995] [internal quotation marks omitted]). On the other hand, "if two constructions of a criminal statute are plausible, the one more favorable to the defendant should be adopted in accordance with the rule of lenity" (*People v Green*, 68 NY2d 151, 153 [1986] [internal quotation marks omitted]). In any event, "the core question always remains that of legislative intent" (*id.* [internal quotation marks omitted]).

■ To begin with, the legislative history is of little help in determining whether assumption of identity was intended to be a distinct element of the crime. In 2002, reports of identity theft were on the rise, and New York was second only to California in terms of the prevalence of identity theft complaints (Sponsor's Mem, L 2002, ch 619, McKinney's Session Laws of NY at 2093-2094 [hereinafter 2002 Sponsor's Mem]). As a result, the legislature created the offense of identity theft, in addition to other offenses such as unlawful possession of personal identification information (*see id.*). The statute was intended to aid prosecution of identity theft by clarifying that " 'theft of identity' is considered a crime" and by ensuring that individuals, not credit card companies alone, would be considered victims entitled to restitution (*id.*). At the time, the expansion of Internet commerce left consumers increasingly vulnerable to identity theft (*Identity Theft: Is Your Identity Safe?*, 2000 Rep of Senate Comm on Investigations, Taxation, and Govt Operations at 3 [hereinafter 2000 Senate Report]). Identity theft is often perpetrated anonymously over the Internet, where a person's identity is typically not verified (*see id.* at 10). This helps to explain why the legislature found it appropriate to include the unlawful use of personal identifying information in its framing of proscribed conduct. In our modern age of technology, identity theft is perhaps more easily and more fruitfully accomplished through the use of another's personal information—used to apply for a mortgage or credit card, for example—rather than by presenting oneself as another (*see id.* at 1-4).

However, the legislative history does not confirm an intent to criminalize as identity theft the use of another's personal identifying information when that use does not result in the assumption of that person's identity.[2] Therefore, although the statute was intended to proscribe Internet identity theft and other fraudulent use of personal information where an assump-

---

**2.** As discussed below, it is possible to use another's personal identifying information without concomitantly assuming that person's identity.

tion of identity occurs, we cannot say that it was designed to be so broad as to encompass the conduct of someone who, like defendant, uses another's personal identifying information but does *not* assume his or her identity.

■ Moreover, the statute is facially ambiguous, because it is unclear whether the words that follow the phrase "assumes the identity of another person" are intended to define that phrase—in which case, committing one of the described acts would constitute an assumption of identity—or whether they serve as various means by which assumption of identity *can*, but does not necessarily, take place. The statute's definitional section (Penal Law § 190.77) helps to elucidate our query. That section clearly defines, inter alia, "personal identifying information," which includes a person's "credit card account number or code" (Penal Law § 190.77 [1]).[3] However, the phrase "assumes the identity of another" does not appear in the list of definitions (*see id.*).

Had the legislature specifically defined the phrase, the question of interpretation presented here would not be an issue. The statute could have included, for example, a definition that might have read "a person 'assumes the identity of another' when he or she (1) presents himself or herself as that person, (2) acts as that person, or (3) uses the personal identifying information of that person." Instead, the legislature simply included in the body of the provision the three methods by which a person can assume the identity of another. As a result, the legislative intent remains nebulous. On one hand, the legislature may have intended to define "assumes the identity of another" in the wording of the statute itself, implying that a person necessarily assumes the identity of another simply by engaging in one of the listed methods. On the other hand, by excluding the phrase from the list of definitions, the legislature may have intended that the methods provided in the body of the statute are ways by which a person *can* assume another's identity, but that assumption of identity must be the result of the method used.

Because the statute is susceptible to these two reasonable interpretations and the legislative history is inconclusive, we decide this issue in accordance with the rule of lenity and sanction the interpretation more favorable to defendant (*see Green,* 68 NY2d at 153). Clearly, the more favorable interpretation

---

**3.** It is undisputed that defendant used Catalfamo's personal identifying information, since the evidence established that he repeatedly authorized the use of Catalfamo's credit card account to pay for hotel expenses.

would require the People to prove both elements, that defendant used Catalfamo's personal identifying information *and* that he consequently assumed Catalfamo's identity. In addition, we think this is the more sensible reading according to the plain meaning of the statute because the word "by," as used in the phrase "assumes the identity of another person by [one of the enumerated methods]," indicates the vehicle by which the assumption of identity takes place. It does not, however, indicate that assumption of identity is an inevitable consequence of using a person's identifying information. Put another way, although the statute provides three alternative *means* by which a defendant may commit the offense, assumption of identity must be the end result. Accordingly, whether defendant "assumed the identity" of another is a separate and essential element of the offense of identity theft which must be proven beyond a reasonable doubt.

To treat assumption of identity as an element of the crime does not, as the People argue, require proof that defendant used another's identifying information *and* that he presented himself as another. The People are correct that a defendant can assume another's identity by using personal identifying information, without ever presenting herself or acting as the other person. The statute is clear in that regard, because using personal identifying information is one of the disjunctive methods by which one can assume another's identity. However, the People fail to recognize that, conversely, a person can use the personal identifying information of another *without* assuming that person's identity. Engaging in the former does not necessarily result in the latter.

Presenting oneself as another—e.g. affirmatively stating "I am John Doe" or signing another person's name—is the quintessential way in which one assumes another's identity. Indeed, it is difficult to imagine a situation in which presenting oneself as another would not result in an assumption of that person's identity. By contrast, assumption of identity is not necessarily accomplished when a person uses another's personal identifying information. The use of that information can be accompanied by an implicit assumption of identity, but that will not always be the case. In a typical credit card transaction, for example—when a person offers a credit card to pay for a hotel stay or to purchase an item at a store, or enters the person's credit card information to make an Internet purchase—it is implied that the person presenting or using the card *is* the card-

holder, even if the person does not affirmatively present himself or herself as such (see People v Wilson, 52 AD3d 239, 240 [1st Dept 2008], lv denied 11 NY3d 743 [2008] [suppression motion properly denied where arresting officer viewed the defendant rapidly purchasing multiple MetroCards with multiple credit cards at vending machine]; People v Vandermuelen, 42 AD3d 667, 670 [3d Dept 2007], lv denied 9 NY3d 965 [2007] [evidence was legally sufficient to establish commission of identity theft where the defendant opened credit card account in victim's name, using victim's identifying information, and made three charges with credit card]). Using another's credit card will, in most cases, also necessarily constitute an implied assumption of that person's identity.

■ The implication falls away, however, when the person accepting the credit card knows that the card user is, in fact, someone other than the cardholder. Without that inference—where, as here, the person presenting the card indicates that he or she has the cardholder's authorization to charge the card, and where the vendor is aware of the card user and cardholder's distinct identities—assumption of identity does not result. In the rare case where the implied assumption of identity is lacking, identity theft cannot be committed via the use of another's credit card. Such is the case before us.

Here, defendant undoubtedly used Catalfamo's credit card information without authorization (after the initial third-party billing agreement had expired), but he did not assume Catalfamo's identity by doing so. Defendant simply misrepresented his authority to use Catalfamo's card, and because the hotel staff knew that he was in fact not Catalfamo, the ordinary inference that a person using a credit card is the cardholder did not arise.

Defendant first used Catalfamo's credit card pursuant to a third-party billing agreement that Catalfamo had executed with the hotel's employees. Upon his initial arrival at the hotel in February 2010, defendant affirmatively stated to Vega that Catalfamo was going to pay for his hotel stay and that the charges would have to be limited to $2,300. Furthermore, Catalfamo spoke over the phone with hotel employees to confirm the terms of the agreement, and wrote the specific monetary limit on the face of the third-party billing agreement. He explicitly indicated that the agreement was authorized for one swipe only and for a maximum charge of $2,300. Weber, the hotel's front-desk manager, also wrote the charge limit on the face of the agreement. This means that, at least initially, the hotel staff

knew defendant's true identity, and they knew that he was not the person whose card was being attached to his computer profile. Therefore, the hotel was aware that defendant was not Catalfamo; it could not thereafter have properly drawn the inference of identity that ordinarily arises in credit card transactions.

Due to the hotel's error, neither Catalfamo's name nor the billing agreement were ultimately attached to defendant's computer profile, and the credit card was not deleted from defendant's profile when he departed the hotel in February 2010. Nevertheless, the employees who testified at trial had knowledge of the agreement and knew or had known that defendant was not using his own credit card. All of the hotel staff that testified at trial knew defendant as Scott Barden or Bane Barden. None of them believed he was Anthony Catalfamo. The hotel's front-office director, Angulo, identified hotel documents associated with defendant, all of which listed him as the guest. At one point in March 2010, when Weber confronted him about the expired third-party billing agreement, defendant even stated that he was authorized to use Catalfamo's credit card after February, necessarily implying that the card did not belong to defendant. Defendant misrepresented his authority to use Catalfamo's credit card. However, he never presented himself as Catalfamo, nor did he implicitly assume Catalfamo's identity by using his credit card.

Furthermore, contrary to the People's assertion, the evidence does not show that Catalfamo endured the "unique harms suffered by individuals whose identities have been stolen." Defendant rightly points out that the harms suffered by those whose identities have been stolen—"damaged reputations, bad credit reports and the resource-consuming task of trying to correct the false credit record information" (2002 Sponsor's Mem at 2094)—are often more severe than the harms suffered by victims of theft whose identities have not been stolen. The People argue that victims "can spend hundreds of hours and thousands of dollars to clear their names and restore their credit" (2000 Senate Report at 3). However, the evidence in this case did not show that Catalfamo experienced such difficulty; to the contrary, the evidence suggests that he was able to have American Express initiate the chargeback fairly easily. Regardless of the effect on Catalfamo, defendant cannot be guilty of identity theft unless he knowingly and factually assumed Catalfamo's identity.

Our decision should not foment any worry that someone in defendant's position could avoid criminal liability altogether. There are offenses under which his conduct more squarely falls, such as unlawful possession of personal identification information and theft of services (he was not charged with the former offense, but he was convicted of the latter). Identity theft is a serious issue, to be sure, but we cannot give the statute so broad a reading as to bring defendant's conduct within its orbit (*People v Harper*, 75 NY2d 313, 318 [1990]; *People v Gottlieb*, 36 NY2d 629, 632 [1975]).

Accordingly, the evidence was insufficient to establish that defendant "assume[d] the identity of another person" as required by Penal Law § 190.80, and defendant's conviction of identity theft in the first degree should be vacated and the count dismissed.

B. Possession of Stolen Property

"A person is guilty of criminal possession of stolen property in the fourth degree when he knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof . . . and when . . . [t]he property consists of a credit card" (Penal Law § 165.45 [2]).

Defendant argues that the evidence was legally insufficient to support his convictions of possession of stolen property in the fourth degree (Penal Law § 165.45) and one count of theft of services (Penal Law § 165.15 [1]) because (1) a credit card number is intangible and a person can only be convicted of possession of stolen property if he or she possesses tangible property, (2) there was no stolen property because Catalfamo always possessed his credit card, and (3) even if the crime could be committed by possession of intangible information, defendant did not physically or constructively possess Catalfamo's credit card number.[4] Insofar as defendant's arguments may have been unpreserved, we reach them in the interest of justice. Nevertheless, we find defendant's contentions unconvincing.

First, much of defendant's argument that it is impossible to criminally possess intangible property is rooted in the Penal Law's definition of "possess." The term is found in the section

---

4. Defendant argues that, because a credit card number cannot be stolen, the evidence was legally insufficient to support his conviction of one count of theft of services under Penal Law § 165.15 (1) (which penalizes a person who obtains a service "by the use of a credit card . . . which he knows to be stolen"). Defendant does not dispute the legal sufficiency of his conviction of the second theft of services count, under Penal Law § 165.15 (2).

containing definitions of general applicability, which prescribes that the terms defined therein have their assigned meanings throughout the Penal Law "[e]xcept where different meanings are expressly specified in subsequent provisions" (Penal Law § 10.00). In section 10.00, " '[p]ossess' means to have physical possession or otherwise to exercise dominion or control over *tangible* property" (Penal Law § 10.00 [8] [emphasis added]).[5] Taken together, section 10.00 and paragraph (8) indicate that "possess," as used throughout the Penal Law, should apply only to tangible property unless otherwise specified.

■ However, the plain language of the statute at issue and a broader view of the Penal Law suggest that the legislature has not always imbued the term "tangible," as it appears in section 10.00 (8), with such significance. For example, as an interesting point of comparison, the offense of unlawful possession of personal identification information applies almost exclusively to possession of *intangibles* (*see* Penal Law § 190.81 *et seq.* [making it a crime to "knowingly possess() (inter alia) a person's financial services account number or code, . . . credit card account number or code, . . . (or) mother's maiden name . . . knowing such information is intended to be used in furtherance" of a crime]). Yet that provision does not expressly modify the general definition of "possess." To conclude that the legislature intended to apply the general definition of "possess" to that offense would lead to an absurd result: the provision would be almost entirely nullified. We cannot accept that the legislature intended to pass a statute that would be stillborn because of the use of the word "tangible" in the definition of "possess." Because "courts should not legislate or nullify statutes by overstrict construction" (*People v Versaggi*, 83 NY2d 123, 131 [1994]) and because we must seek to effect the legislature's objectives, unlawful possession of personal identification information must embrace the possession of intangible property.

Similarly, the mention of "tangible property" in section 10.00 (8) cannot strictly apply to criminal possession of stolen prop-

**5.** Black's Law Dictionary defines "tangible property" as "[p]roperty that has physical form and characteristics" (Black's Law Dictionary [9th ed 2009], property). "Intangible property," by contrast, is defined as "[p]roperty that lacks a physical existence" such as "stock options and business goodwill" (*id.*). A number, such as a credit card number, is intangible although it may be reduced to a tangible medium as in the form of an imprinted plastic credit card. The parties do not dispute that Catalfamo's credit card number—as opposed to the credit card on which the number is embossed—is intangible.

erty, because to do so would thwart the legislative intent to criminalize the knowing possession of certain types of intangible stolen property. This analysis is borne out by reference to Penal Law § 155.00, which contains definitions applicable to criminal possession of stolen property as well as other offenses involving theft (located in title J of the Penal Law). That section provides a definition of property that clearly includes intangible items (*see* Penal Law § 155.00 [1] [" '(p)roperty' means any . . . computer data, computer program," or "thing of value . . . .which is provided for a charge or compensation"]). In fact, the Court of Appeals has ruled that intangible rights constitute property, at least inasmuch as larceny by extortion is concerned (*People v Garland*, 69 NY2d 144 [1987] [rights of tenants to occupy and possess their apartments are "property" that can be extorted]; *see also People v Spatarella*, 34 NY2d 157, 162 [1974] ["advantageous business relationship which was based on an at-will arrangement" constituted "property" under extortion statutes]).[6]

Although we are not aware of any appellate case law on the particular issue at hand, there has been some disagreement among lower courts, since *Garland*, concerning whether property must be tangible in order to garner a conviction for possession of stolen property. First, in *People v Molina*, the Queens County Criminal Court dismissed a complaint as facially insufficient where a defendant possessed telephone credit card numbers written on a piece of paper, reasoning that "the numbers in and of themselves are not tangible property" and "the mere isolated knowledge of those numbers . . . ha[d] not yet been defined by the [l]egislature as a crime" (145 Misc 2d 612, 615 [1989]). One year later, in *People v Johnson*, the New York County Criminal Court declined to follow *Molina* on essentially identical facts because the number had inherent value and "there is little, if any, relevance to the form in which the telephone credit card number is possessed" (148 Misc 2d 103, 110 [1990]). Two years later, the New York County Supreme Court, analyzing *Molina* and *Johnson*, sided with *Molina* and dismissed criminal possession charges where the defendants possessed telephone authorization codes on home phones or on

---

**6.** In reaching its conclusion, the *Spatarella* Court favorably reviewed previous Court of Appeals and Appellate Division decisions that had "construed the term 'property' . . . for the purpose of defining the kind of property which can be threatened [under the extortion statutes], and consistently held the term to include intangible rights" (*Spatarella*, 34 NY2d at 162 [noting that an employer's business, a painter's job, and a milk route were each properly deemed "property"]).

pieces of paper (*People v Tansey*, 156 Misc 2d 233 [1992]). The court reasoned that the wording of Penal Law § 165.45 and the general definition of "possess," read together, "makes clear that the possession of such intangible . . . codes ha[d] not yet been designated a crime" (*id.* at 239-240).

Notably, each of these cases preceded the 2002 creation of unlawful possession of personal identification information, a crime that, as discussed above, indicates the diminished relevance of the term "tangible" in the Penal Law's definition of "possess." We are thus inclined to reject the reasoning of *Molina* and *Tansey* and, instead, adopt an analysis more consistent with *Johnson*. The proposition that intangible property cannot be criminally possessed leads to the bizarre result that a person may commit larceny of intangible property, but may not be guilty of criminally possessing the very property which he or she has stolen (*see* Richard A. Greenberg et al., Criminal Law § 15:24 [3d ed 6 West's NY Prac Series 2007]). The *Tansey* court pointed out that "[i]n neither *Spatarella* nor *Garland* did the Court [of Appeals] suggest that this view of property would be applicable to larceny by means other than extortion, or to a possession offense" (*Tansey*, 156 Misc 2d at 239). However, the Court did not foreclose the possibility of expanding that view to criminal possession offenses.

It is evident to us that, by creating a distinct definition of "property" that applies to all offenses involving theft and undoubtedly incorporates intangibles, the legislature intended to include intangible items within the purview of section 165.45, notwithstanding that the definition of "possess" remains unaltered in that provision. Apparently, when the legislature created the offense of criminal possession of stolen property— and subsequently unlawful possession of personal identification information—it either overlooked the term "tangible" in section 10.00 (8), or it considered the term inconsequential. It is more sensible to read section 10.00 (8) as clarifying that possession can be physical or constructive, rather than denoting that only tangible property can be criminally possessed. Therefore, a person can commit criminal possession of stolen property when he or she possesses stolen property that is intangible.

■ Of course, the question presented is not resolved by our determination of the tangible/intangible dichotomy. We must further determine whether possession of a credit card number is sufficient to convict defendant of criminal possession of stolen property in the fourth degree. We have considered defendant's

argument that the definition of "credit card" as used in the statute forecloses application to credit card numbers, but we ultimately find it unavailing. For purposes of the offense at issue (as well as other theft offenses under title J of the Penal Law), a " '[c]redit card' means any instrument or article defined as a credit card in [section 511] of the general business law" (Penal Law § 155.00 [7]). That section of the General Business Law defines "credit card" to include "any credit card, credit plate, charge plate, courtesy card, or other identification card or device issued by a person to another person which may be used to obtain . . . credit or to purchase or lease property or services on the credit of the issuer or of the holder" (General Business Law § 511 [1]). This definition appears to exclude credit card numbers. In fact, General Business Law § 511-a clarifies that "[f]or purposes of this article [i.e. article 29-A of the General Business Law] 'credit card' shall also mean any number assigned to a credit card" (General Business Law § 511-a). The addition of General Business Law § 511-a suggests the legislature's belief that, prior to the amendment, the definition in section 511 did not incorporate credit card numbers. The People contend that, because section 511-a modifies all of article 29-A, it also necessarily modifies the definition found in section 511 (1), so that the term "credit card" includes credit card numbers for purposes of Penal Law § 155.00 as well as article 29-A of the General Business Law. We agree.

The trial court instructed the jury that the broader definition of credit card, which includes credit card numbers, applies to criminal possession of stolen property. Although the parties appear to have overlooked it, the legislative history might seem to indicate that the addition of General Business Law § 511-a in 2002 was meant to apply only to the General Business Law (2002 Sponsor's Mem at 2093 ["Section 511-a is created in the (General Business Law), providing that only for purposes of the (General Business Law) the term 'credit card' shall also mean any number assigned to a credit card"]). However, because § 511-a purports to modify the definition of "credit card" for the purposes of the same article of the General Business Law in which section 511 appears, it follows that General Business Law § 511-a modifies section 511. As a result, the Penal Law's reference to General Business Law § 511 also incorporates the expanded definition found in section 511-a.

Moreover, as set forth above, the definition of "property" in Penal Law § 155.00 sufficiently demonstrates the legislature's

intent to criminalize the possession of intangible stolen property, under which falls a credit card number. Because possession of the credit card number enabled defendant to access the value of Catalfamo's line of credit, the credit card number is a "thing of value . . . which is provided for a charge or compensation" (*see* § 155.00 [1]; *Johnson*, 148 Misc 2d at 112), and we deem it property that can be stolen and criminally possessed. It would run contrary to the legislative intent underlying the statute to hold that credit card numbers could not be possessed as stolen property, when the account associated with a credit card, not the physical card alone, has inherent value. The credit card number, along with other information embossed on the card, allows a person who possesses it to charge the card up to the account limit. Additionally, as noted in *Johnson* with respect to telephone calling cards, "the charge attaching to the credit card number is, of course, a subsequent charge, for calls that are placed by using that number" (148 Misc 2d at 112). Likewise, the "charge" associated with a credit card is a subsequent charge, plus any applicable interest and fees, for purchases made by the card user.

▇ Therefore, a credit card number is "property" for the purposes of the possession offenses. It is irrelevant whether defendant had physical or constructive possession over a tangible credit card, because he had access to the full value of Catalfamo's account as if he had possessed the credit card itself. The legislative intent would be stifled by a contrary interpretation of the statute.

To accept defendant's narrow construction of the statute, while concurrently recognizing that the definition of "property" in Penal Law § 155.00 embraces other intangibles, would lead to the anomalous result that defendant could not be guilty of the fourth degree crime charged for possessing a credit card number, but could be guilty of any other degree of the crime for engaging in the very same conduct, because the term "credit card" only appears in criminal possession of stolen property in the fourth degree and not in other degrees of the crime. For example, because "property" includes intangibles for the purposes of offenses involving theft, a defendant could be guilty of possession of stolen property in the third degree for possession of a credit card number where the value of the account associated with the card "exceeds three thousand dollars" (*see* Penal Law § 165.50), but he or she could not be guilty of the lesser crime in the fourth degree, simply because the term

"credit card" appears in that provision. To prevent such an absurdity, we must accept that a credit card number can be the subject property in a charge of criminal possession of stolen property in the fourth degree. Although defendant's conduct might fall more squarely within the crime of unlawful possession of personal identification information (Penal Law § 190.81 *et seq.*), we find that possession of a stolen credit card number is within the ambit of criminal possession of stolen property.

■ Furthermore, we reject defendant's argument that, because Catalfamo continued to possess his credit card during defendant's stay at the hotel, there was no stolen property. The card became stolen property in March 2010, when defendant had the intent to appropriate property and began wrongfully charging Catalfamo's card after the expiration of the third-party billing agreement (*see* Penal Law § 155.05 ["A person steals property and commits larceny when, with intent . . . to appropriate (the property of another) . . . he wrongfully takes, obtains, or withholds such property from an owner thereof"]; § 155.00 [4] [to "appropriate" property means, inter alia, "to exercise control over (the property of another) . . . under such circumstances as to acquire the major portion of its economic value or benefit"]). Furthermore, in *Matter of Reinaldo O.* (250 AD2d 502, 503 [1st Dept 1998], *lv denied* 92 NY2d 809 [1998]), we observed that "acquisition of a credit card number meets th[e] definition [of 'appropriate' in section 155.00 (4)] because the number itself permits the thief to make purchases . . . up to the credit limit." Here, defendant clearly obtained Catalfamo's credit card number because he was able to charge expenses to the card, and he had the intent to appropriate the card number because he instructed hotel employees to charge what he knew to be Catalfamo's credit card, thereby acquiring a major portion of the card's value. Thus, the card number was stolen despite Catalfamo's continued possession of the tangible card.

■ Finally, we find meritless defendant's argument that he did not constructively possess the credit card number. To prove that defendant had constructive possession of the property, "the People must show that the defendant exercised 'dominion or control' over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized" (*People v Manini*, 79 NY2d 561, 573 [1992]). The record shows that defendant was able to charge hotel expenses and services to Catalfamo's American Express credit card by directing hotel employees to charge the

"card on file." The hotel's employees, believing defendant's misrepresentations of authority to use the card, followed his directives. Whether defendant actually knew the credit card number is immaterial; irrespective of his knowledge, he was able to use the card number and acquire goods and services for his own benefit. Defendant's ability to have the account charged at his request demonstrates that he had sufficient dominion or control to constructively possess the credit card number contained in the hotel's computer system (*see Manini*, 79 NY2d at 573).

Accordingly, defendant's convictions of criminal possession of stolen property in the fourth degree and theft of services (based on his use of Catalfamo's credit card) were supported by legally sufficient evidence.

Lastly, we have considered and rejected defendant's speedy trial argument.

Accordingly, the judgment of the Supreme Court, New York County (Gregory Carro, J., at speedy trial motion; Juan M. Merchan, J., at jury trial and sentencing), rendered December 7, 2011, as amended December 12, 2011, convicting defendant of identity theft in the first degree, criminal possession of stolen property in the fourth degree, and two counts of theft of services, and sentencing him to an aggregate term of $2^{1}/_{3}$ to 7 years, should be modified, on the law and as a matter of discretion in the interest of justice, to the extent of vacating the identity theft conviction and dismissing that count, and otherwise affirmed.

SWEENY, J.P., SAXE, MOSKOWITZ and CLARK, JJ., concur.

Judgment, Supreme Court, New York County, rendered December 7, 2011, as amended December 12, 2011, modified, on the law and as a matter of discretion in the interest of justice, to the extent of vacating the identity theft conviction and dismissing that count, and otherwise affirmed.